**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **TREVOR MATTIS,** | ) | **C.A. No. 16-306 Erie** |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **Magistrate Judge Baxter** |
| | ) | |
| **DEPARTMENT OF CORRECTIONS,** | ) | |
| **et al.,** | ) | |
| **Defendants.** | ) | |


**MEMORANDUM OPINION**[1]

United States Magistrate Judge Susan Paradise Baxter


**I.      INTRODUCTION**

**A.      Relevant Procedural History**

On December 21, 2016, Plaintiff Trevor Mattis, an inmate incarcerated at the State

Correctional Institution at Forest in Marienville, Pennsylvania ("SCI-Forest"), initiated this civil

rights action by filing a *pro se* complaint pursuant to 42 U.S.C. § 1983. Named as Defendants are

the Department of Corrections ("DOC"), DOC Secretary John Wetzel ("Wetzel"), and the

following individuals who were either staff members or medical personnel at SCI-Forest at all

times relevant to the claims in this case: Superintendent M. Overmyer ("Overmyer"); Unit

Manager Gustafson (incorrectly identified by Plaintiff as "Gustafason") ("Gustafson");

Counselor Cummins ("Cummins"); Unit Manager Best ("Best"); Sergeant Mealy ("Mealy"); Dr.

Hasper ("Hasper"); Ms. Kennedy ("Kennedy"); Ms. Sheesley ("Sheesley"); K. Smith ("Smith");

Sergeant Anthony ("Anthony"); Sgt. Gilara ("Gilara"); Unit Manager Blicha ("Blicha"); C.O.

---

1

The parties have consented to having a United States Magistrate Judge exercise jurisdiction over this matter. [ECF
Nos. 4, 16, 18).

Small ("Small"); and Nursing Practitioner McNeely ("McNeely"). For ease of reference, all Defendants other than Defendants Hasper and McNeely will be collectively referred to as "DOC Defendants."

Plaintiff alleges multiple claims against one or more of the Defendants, based on alleged violations of his constitutional rights and/or his rights under Title II of the Americans with Disability Act ("ADA"), and Section 504 of the Rehabilitation Act ("Rehab Act"). In addition, Plaintiff alleges a state tort claim of intentional infliction of emotional distress. In particular, Plaintiff identifies the following claims:

1. A claim against Defendant DOC for failure to train unit managers and counselors to make appropriate housing determinations for inmates (ECF No. 3, Complaint, at ¶ 219);

2. An Eighth Amendment claim against Defendant McNeely for failure to diagnose Plaintiff's "flat feet condition" and recommending that he be allowed to wear boots to the yard for morning exercise (Id. at ¶¶ 162-164, 177-182, 220);

3. An Eighth Amendment claim against Defendant Overmyer for "forcing" Plaintiff to wear "skippies" to the yard (Id. at ¶¶ 162-164, 177-182, 221);

4. A Fourteenth Amendment claim against Defendant Gilara for confiscating Plaintiff's eyeglass strap (Id. at ¶¶ 199, 222);

5. A First Amendment access to courts claim against Defendant Gilara arising from the confiscation of Plaintiff's legal materials (Id. at ¶¶ 200-201, 223);

6. An Eighth Amendment claim against Defendant McNeely arising from her refusal to recommend the return of Plaintiff's eyeglass strap (Id. at ¶¶ 206, 224);

7. An Eighth Amendment claim against Defendant Blicha for refusing to allow Plaintiff to retain a cup in his cell (Id. at ¶¶ 204-206, 225);

8. An Eighth Amendment claim against Defendant Small for exposing Plaintiff to O/C spray (Id. at ¶¶ 190-195, 226);

9.      Eighth and Fourteenth Amendment due process claims against Defendants Overmyer, Gustafson, Cummins, Hasper, and Kennedy for removing Plaintiff's Z-code and forcing him to take a cellmate (<u>Id</u>. at ¶¶ 13-128, 229);

10.     A Fourteenth Amendment due process claim against Defendant Small for allegedly stealing and/or destroying Plaintiff's creative materials (<u>Id</u>. at ¶¶ 194, 212, 227);

11.     An Eighth Amendment claim against Defendant Wetzel for failing to prevent alleged abuses at SCI-Forest (<u>Id</u>. at ¶¶ 211, 228);

12.     ADA and Rehab Act claims against Defendants DOC, Overmyer, and Smith for failing to make reasonable accommodations for Plaintiff's PTSD condition (<u>Id</u>. at ¶¶ 150-151, 230);

13.     A Fourteenth Amendment equal protection claim against Defendants Overmyer, Gustafson, and Cummins related to the denial of Plaintiff's Z-code status (<u>Id</u>. at ¶¶ 13-128, 231);

14.     An Eighth Amendment claim against Defendants Hasper, Simons, Cowen, Sheesley, and Kennedy for recommending removal of Plaintiff's Z-code (<u>Id</u>. at ¶¶ 39-44, 76-82, 209, 232);

15.     An Eighth Amendment claim against Defendants Best, Mealy, and Anthony for requiring Plaintiff to take a cellmate (<u>Id</u>. at ¶¶ 104-128, 233);

16.     A claim of intentional infliction of emotional distress against Defendants Gustafson, Cummins, Best, and Anthony for "orchestrating a violent confrontation with other inmates" (<u>Id</u>. at ¶¶ 76-128, 234);

17.     A Fourteenth Amendment equal protection claim against Defendants Overmyer, Best, and Cummins arising from their recommendation that Plaintiff be placed on the RRL while other similarly situated inmates were not (<u>Id</u>. at ¶¶ 152, 196-198, 236);

18.     An Eighth Amendment claim against Defendants Overmyer and Blicha for placing Plaintiff in solitary confinement in "cold" conditions for over four weeks (<u>Id</u>. at ¶¶ 237 and 237(b));

19.     An Eighth Amendment claim against Defendants McNeely and Smith for failing to provide Plaintiff with medical treatment (<u>Id</u>. at ¶ 238); and

20.    An Eighth Amendment claim against Defendant Overmyer for allowing and condoning "the harassment and abuse of Plaintiff by RHU prison officials (Id. at ¶¶ 125-218, 239).

On May 30, 2017, Defendant Hasper filed a motion to dismiss Plaintiff's complaint [ECF No. 31] arguing, *inter alia*, that Plaintiff's complaint fails to state a claim upon which relief may be granted against him. Plaintiff filed a response in opposition to Defendant Hasper's motion on June 8, 2017 [ECF No. 40]. On July 11, 2017, the DOC Defendants filed their own motion to dismiss [ECF No. 47], also arguing, *inter alia*, that Plaintiff has failed to state a cause of action upon which relief may be granted against them. Plaintiff has since filed a response in opposition to this motion [ECF No. 50]. This matter is now ripe for consideration.[2]

## B.    Relevant Factual History

Plaintiff alleges that, in 1992, he was diagnosed with Post Traumatic Stress Disorder ("PTSD") and assigned Z-code status, which kept him from being celled with another inmate. (ECF No. 3, Complaint, at ¶ 13). According to Plaintiff, his PTSD condition causes him to become anxious, "extremely paranoid," and violent when another inmate is celled with him. (Id. at ¶¶ 15, 17). In addition, Plaintiff alleges that he cannot sleep, concentrate, or function in a normal manner, and suffers debilitating headaches, in the presence of another inmate. (Id. at ¶ 16).

In July 2015, Plaintiff was seen by Defendant Cummins for his annual review, at which time Defendant Cummins asked Plaintiff to explain his Z-code status. (Id. at ¶ 23). Plaintiff explained that he was previously assaulted by a cellmate while he was sleeping, and had experienced other violent encounters with cellmates, that made him "rather dysfunctional and

---

[2] Defendant McNeely filed an answer to Plaintiff's complaint on June 21, 2017 [ECF No. 46] and, thus, has not joined in the pending motions to dismiss. As a result, Plaintiff's claims against Defendant McNeely will not be addressed herein.

volatile if another inmate is in the cell with him." (Id. at ¶ 28). As a result, Plaintiff informed

Defendant Cummins that if his Z-code was removed and he was forced to have a cellmate, "there

would be big problems." (Id. at ¶ 29). Plaintiff and Defendant Cummins were subsequently

joined by Defendant Gustafson, who allegedly told Plaintiff that he didn't see a reason why

Plaintiff should have a Z-code and that he was "going to take it." (Id. at ¶ 32). Plaintiff responded

that if he was forced to take a cellmate, he would stab the cellmate as many times as he could;

however, both Defendants Cummins and Gustafson allegedly voiced their lack of concern. (Id. at

¶¶ 33-37).

On July 29, 2015, Plaintiff was seen by the Psychological Review Team ("PRT"),

consisting of, among others, Defendants Cummins, Gustafson, and Kennedy. (Id. at ¶ 39).

Defendant Kennedy allegedly asked Plaintiff how he felt about taking a cellmate, to which

Plaintiff responded that he couldn't take a cellmate because of his serious anxiety issues. (Id. at

¶¶ 41-42). Defendant Kennedy then postponed the PRT review pending a psychiatric evaluation

of Plaintiff. (Id. at ¶ 43).

On November 18, 2015, Plaintiff was seen by Defendant Hasper, at which time he

recounted many violent incidents he had encountered during his incarceration and the mental

health symptoms he suffered as a result. (Id. at ¶¶ 49-59). Defendant Hasper allegedly asked if

Plaintiff would like medication to help his insomnia, but Plaintiff refused, citing an aversion to

psychotropic medications. (Id. at ¶¶ 61-63). Plaintiff alleges that Defendant Hasper then told him

that he "definitely need[ed] to be housed by [him]self." (Id. at ¶ 67). Plaintiff saw Defendant

Hasper again on December 18, 2015, and reported that his panic attacks were becoming more

severe and he was beginning to experience "daily spontaneous diarrhetic [sic] bowel movement."

(Id. at ¶ 70). Defendant Hasper allegedly informed Plaintiff that his PTSD symptoms were

getting worse and again suggested psychotropic medications, which were refused by Plaintiff. (Id. at

¶ 71).

On February 8, 2016, Plaintiff went to the medical department for a follow-up visit with Defendant Hasper, and was made to wait while Defendant Cummins entered Defendant Hasper's office and exited five minutes later. (Id. at ¶¶ 83-85). Plaintiff alleges that, unlike previous visits, Defendant Hasper's demeanor was "cold and distanced," while he encouraged Plaintiff to work with his counselor. (Id. at ¶¶ 85-90).

On February 18, 2016, Defendants Cummins and Gustafson informed Plaintiff that his Z-code was being removed and that he had thirty days to find a cellmate. (Id. at ¶¶ 94-95). Plaintiff alleges that he "began to suffer pounding headaches, experienced severe panic attacks and could hardly sleep at night." (Id. at ¶ 102). Around the second week of March, Defendant Best asked Plaintiff if he had found a cellmate yet, to which Plaintiff reiterated his concerns about being celled with another inmate; nevertheless, Plaintiff was told that he had a week to find a cellmate. (Id. at ¶¶ 104-108).

On March 21, 2016, Plaintiff was seen at sick call for high blood pressure and rapid weight loss. Plaintiff's blood pressure medication was changed and blood pressure readings were ordered to be taken three times per week for four weeks. (Id. at ¶¶ 109-110). The next day, Defendant Best told Plaintiff he was getting a cellmate, who Plaintiff alleges was a "notorious gang member" named "Richardson aka Hell Boy," but Richardson allegedly refused to be celled with Plaintiff. (Id. at ¶¶ 112-115). Then, on March 26, 2016, Plaintiff alleges that Defendant Mealy attempted to have Plaintiff celled with a Bloods gang member, but was allegedly dissuaded from doing so by other gang members. (Id. at ¶¶ 116-117).

On March 28, 2016, Defendant Mealy allegedly asked Plaintiff what he would do if he was celled with another inmate and Plaintiff responded that he would "hurt them before they hurt me from the door, no ifs ands or buts." (Id. at ¶¶ 118-119), Nevertheless, while "dozing off in his cell" on March 30, 2016, Plaintiff saw his cell door opening and a "strange inmate" entering his cell, which allegedly caused Plaintiff to "snap" and attack the inmate. (Id. at ¶¶ 121-122). During the ensuing melee, Plaintiff received a "stunning blow to the back of his head" and a sprained right wrist, while the other inmate suffered serious injuries. (Id. at ¶ 123). Plaintiff was handcuffed and taken to the RHU, at which time he allegedly heard Defendant Mealy lamenting that he was forced to put someone in Plaintiff's cell. (Id.). After Plaintiff was processed at the RHU, Defendant Anthony attempted to place him in a cell with another inmate, but Plaintiff refused and was issued a misconduct. He was then taken to a different pod and placed in a single cell. (Id. at ¶¶ 125-128).

On March 31, 2016, Plaintiff woke with a throbbing headache, couldn't flex his right wrist, felt sharp pain in his lower back, and had a swollen left knee that hindered his ability to walk. (Id. at ¶¶ 129-130). Plaintiff submitted a sick call request and subsequently complained about his injuries to all of the nurses who came to his cell; however, his complaints were allegedly ignored. (Id. at ¶¶ 131-133). On or about April 3, 2016, Plaintiff allegedly blacked out and fell, hitting the right side of his head and lacerating his right forearm and left triceps. (Id. at ¶ 134). Plaintiff complained to a nurse about his new injuries and was told to fill out a sick call slip. (Id. at ¶ 136).

On April 21, 2016, after not being seen by medical staff for weeks, Plaintiff filed a grievance alleging cruel and unusual punishment. At that time, Plaintiff was allegedly suffering from "excessively dry skin" that left "black scabs" and "micro cracks" on his arms, and deeper

cracks in the webbing between his fingers. (Id. at ¶¶ 147-149). Plaintiff was ultimately seen at sick call on May 5, 2016, but the doctor was rushed and walked away before Plaintiff was able to raise all of his medical issues. (Id. at ¶ 154). Thus, Plaintiff submitted another sick call request on May 6, 2016, but, by that time, most of his injuries had resolved on their own. (Id. at ¶ 155).

On May 8, 2016, Defendant Overmyer allegedly went to Plaintiff's cell and told him that he would "never get out of the RHU again," which Plaintiff understood as a "direct threat to his wellbeing." (Id. at ¶ 158).

On July 12, 2016, Plaintiff was seen by Defendant Hasper, who allegedly told Plaintiff that he wasn't there to give him a Z-code, and then assessed Plaintiff with anti-social personality disorder." (Id. at ¶ 189). On July 16, 2016, Plaintiff's cell was "ransacked" by prison officials, at which time Defendant Small allegedly stole and/or destroyed Plaintiff's legal materials and creative works (i.e. poems, screenplays, and songs), and then forced Plaintiff to "stand exposed to the full effects of O/C pepper spray for over 20 minutes." (Id. at ¶¶ 190-193).

On August 26, 2016, Plaintiff was seen by the Program Review Committee ("PRC"), comprised of Defendants Overmyer, Best, and Cummins, and was informed that he was being placed on administrative custody ("A/C") status pending a review for placement on the Restricted Release List ("RRL") because he was considered a threat to other inmates. (Id. at ¶ 198). On the same date, Defendant Gilara confiscated Plaintiff's eyeglass strap, one box of legal materials, and all of Plaintiff's pens. (Id. at ¶¶ 199-200).

In or around September 2016, Defendant Blicha refused to allow Plaintiff to retain a cup in his cell, thus requiring Plaintiff to sip water from the water faucet. (Id. at ¶ 204). Plaintiff alleges that he wrote over four letters to Defendant Wetzel in August and September 2016 detailing "the abuses and harassments SCI-Forest prison officials were subjecting him to," but

received no response. (Id. at ¶ 211).

On November 21, 2016, Plaintiff was moved to an isolated cell at the direction of Defendant Blicha, where he was allegedly subject to inhumane and intolerably cold conditions for over four weeks. (Id. at ¶¶ 213b-213e).

## C.    Standards of Review

### 1.    Motion to Dismiss

A motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6) must be viewed in the light most favorable to the plaintiff and all the well-pleaded allegations of the complaint must be accepted as true. Erickson v. Pardus, 551 U.S. 89, 93-94 (2007). A complaint must be dismissed pursuant to Rule 12 (b)(6) if it does not allege "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007). See also Ashcroft v. Iqbal, 556 U.S. 662, 678 (May 18, 2009) (specifically applying Twombly analysis beyond the context of the Sherman Act).

The Court need not accept inferences drawn by plaintiff if they are unsupported by the facts as set forth in the complaint. See California Pub. Employee Ret. Sys. v. The Chubb Corp., 394 F.3d 126, 143 (3d Cir. 2004) citing Morse v. Lower Merion School Dist., 132 F.3d 902, 906 (3d Cir. 1997). Nor must the court accept legal conclusions set forth as factual allegations. Twombly, 550 U.S. at 555, citing Papasan v. Allain, 478 U.S. 265, 286 (1986). See also McTernan v. City of York, Pennsylvania, 577 F.3d 521, 531 (3d Cir. 2009) ("The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions"). A Plaintiff's factual allegations "must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 556, citing 5 C.Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-36 (3d ed. 2004). Although the United States Supreme

Court does "not require heightened fact pleading of specifics, [the Court does require] enough facts to state a claim to relief that is plausible on its face." Id. at 570.

In other words, at the motion to dismiss stage, a plaintiff is "required to make a 'showing' rather than a blanket assertion of an entitlement to relief." Smith v. Sullivan, 2008 WL 482469, at *1 (D.Del. February 19, 2008) quoting Phillips v. County of Allegheny, 515 F.3d 224, 231 (3d Cir. 2008). "This 'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element." Phillips, 515 F.3d at 234, quoting Twombly, 550 U.S. at 556.

The Third Circuit subsequently expounded on the Twombly/Iqbal line of cases:

> To determine the sufficiency of a complaint under Twombly and Iqbal, we must take the following three steps:
>
> First, the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.' Second, the court should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth.' Finally, 'where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.'

Burch v. Milberg Factors, Inc., 662 F.3d 212, 221 (3d Cir. 2011) quoting Santiago v. Warminster Twp., 629 F.3d 121, 130 (3d Cir. 2010).

**2.     _Pro Se_ Pleadings**

_Pro se_ pleadings, "however inartfully pleaded," must be held to "less stringent standards than formal pleadings drafted by lawyers" Haines v. Kerner, 404 U.S. 519, 520 (1972). If the court can reasonably read pleadings to state a valid claim on which the litigant could prevail, it should do so despite failure to cite proper legal authority, confusion of legal theories, poor syntax and sentence construction, or litigant's unfamiliarity with pleading requirements. Boag v. MacDougall, 454 U.S. 364 (1982); United States ex rel. Montgomery v. Brierley, 414 F.2d 552,

555 (3d Cir. 1969) ("petition prepared by a prisoner... may be inartfully drawn and should be read 'with a measure of tolerance'"); <u>Freeman v. Department of Corrections</u>, 949 F.2d 360 (10th Cir. 1991). Under our liberal pleading rules, a district court should construe all allegations in a complaint in favor of the complainant. <u>Gibbs v. Roman</u>, 116 F.3d 83 (3d Cir.1997) (overruled on other grounds).  <u>See, e.g.</u>, <u>Nami v. Fauver</u>, 82 F.3d 63, 65 (3d Cir. 1996) (discussing Fed.R.Civ.P. 12(b)(6) standard); <u>Markowitz v. Northeast Land Company</u>, 906 F.2d 100, 103 (3d Cir. 1990) (same). Because Plaintiff is a *pro se* litigant, this Court will consider facts and make inferences where it is appropriate.

### D. Discussion

#### 1. Failure to Train Claim v. Defendant DOC

The DOC Defendants assert that Plaintiff's claim against Defendant DOC for failure to train unit managers and counselors to make appropriate housing decisions is barred by Eleventh Amendment immunity. The Court agrees.

The Eleventh Amendment proscribes actions in the federal courts against, *inter alia*, states and their agencies. <u>Laskaris v. Thornburgh</u>, 661 F.2d 23 (3d Cir. 1981) (Pennsylvania); <u>Mt. Healthy City Board of Education v. Doyle</u>, 429 U.S. 274 (1977) (state agencies). "Unless a State has waived its Eleventh Amendment immunity or Congress has overridden it... a State cannot be sued directly in its own name regardless of the relief sought." <u>Kentucky v. Graham</u>, 473 U.S. 159, 167 n. 14 (1985), <u>citing</u> <u>Alabama v. Pugh</u>, 438 U.S. 781 (1978).

It is well-settled that the DOC, which administers all state correctional institutions, is an agency or arm of the Commonwealth of Pennsylvania and is, thus, entitled to the same Eleventh Amendment immunity that the Commonwealth enjoys. <u>See</u> <u>Steele v. Pennsylvania</u>, 2009 WL 614800 at *8 (W.D.Pa. Mar. 6, 2009). No exceptions to Eleventh Amendment immunity are

applicable here. The Commonwealth of Pennsylvania has not consented to be sued, <u>Wilson v. Vaughn</u>, 1996 WL 426538 at *1 n.2 (E.D.Pa. July 30, 1996), nor has Congress expressly abrogated Pennsylvania's Eleventh Amendment immunity from civil rights suits for damages. <u>Smith v. Luciani</u>, 1998 WL 151803 at *4 (E.D.Pa. March 31, 1998), <u>aff'd</u>, 178 F.3d 1280 (3d Cir. 1999) (Table). Moreover, as a state agency, Defendant DOC is not a "person" against whom a civil rights action may be brought under Section 1983. <u>Will v. Michigan Dept. of State Police</u>, 491 U.S. 58, 71 (1989). Accordingly, Plaintiff's Section 1983 claim against Defendant DOC for its alleged failure to train unit managers and counselors to make appropriate housing decisions will be dismissed.

**2.** **Access to Courts Claim v. Defendant Gilara**

Plaintiff alleges that Defendant Gilara's confiscation of one box of his legal materials violated his constitutional right to access the courts because it allegedly caused Plaintiff to miss his September 13, 2016 deadline to submit a "habeas corpus petition to the Federal Courts." (ECF No. 3, Complaint, at ¶¶ 200-201).

Prisoners have a constitutional right to "adequate, effective and meaningful" access to the courts. <u>Bounds v. Smith</u>, 430 U.S. 817 (1977).[3] Importantly, a plaintiff must demonstrate actual

---

[3] The Supreme Court has identified two general categories of denial of access to courts claims. <u>Christopher</u>, 536 U.S. at 412-13; <u>see also</u> <u>Gibson v. Superintendent of N.J. Dep't of Law & Pub. Safety – Div. of State Police</u>, 411 F.3d 427, 441 (3d Cir. 2005) <u>overruled</u> <u>in</u> <u>part</u> <u>on</u> <u>other</u> <u>grounds</u> <u>as</u> <u>noted</u> <u>in</u> <u>Dique v. N.J. State Police</u>, 603 F.3d 181 (3d Cir. 2010). The first type is "forward-looking" claims which allege that official action frustrates a plaintiff in preparing and filing suit at the present time. <u>Christopher</u>, 536 U.S. at 413. The second category covers "backward – looking" claims which allege that official acts "have caused the loss or inadequate settlement of a meritorious case, the loss of an opportunity to sue, or the loss of an opportunity to seek some particular order of relief …. These cases do not look forward to a class of further litigation, but backward to a time when specific litigation ended poorly, or could not have commenced, or could have produced a remedy subsequently unobtainable. The ultimate object of these sorts of access claims, then, is not the judgment in a further lawsuit, but simply the judgment in the access claim itself, in providing relief obtainable in no other suit in the future." <u>Christopher</u>, 536 U.S. at 413-14 (citations omitted).

injury stemming from the denial of access.[4] <u>Lewis v. Casey</u>, 518 U.S. 343 (1996). The actual

injury requirement "derives from the doctrine of standing, a constitutional principle that prevents

courts of law from undertaking tasks assigned to the political branches." <u>Id</u>. at 349. <u>See also</u>

<u>Stokes v. Gehr</u>, 399 Fed.Appx. 697, 699 (3d Cir. 2010) (the actual injury requirement articulated

in <u>Lewis</u> is "derived from principles of standing, … an unwaivable constitutional prerequisite.").

A plaintiff must allege both an underlying cause of action, whether anticipated or lost,

and official acts frustrating the litigation. <u>Christopher v. Harbury</u>, 536 U.S. 403 (2002). In order

to state an access to courts claim, "[w]here prisoners assert that defendants' actions have

inhibited their opportunity to present a past legal claim, they must show (1) that they suffered an

'actual injury' – that they lost a chance to pursue a 'nonfrivolous' or 'arguable' underlying

claim; and (2) that they have no other 'remedy that may be awarded as recompense' for the lost

claim other than in the present denial of access suit." <u>Monroe v. Beard</u>, 536 F.3d 198, 205-06 (3d

Cir. 2008) <u>quoting</u> <u>Christopher</u>, 536 U.S. at 415. "To that end, prisoners must satisfy certain

pleading requirements: The complaint must describe the underlying arguable claim well enough

to show that it is 'more than mere hope,' and it must describe the 'lost remedy.'" <u>Id</u>.

Furthermore, a plaintiff must demonstrate intent on the part of the defendants. The Third

Circuit has explained:

> A denial of access claim is available where the state officials "*wrongfully and intentionally* conceal information crucial to a person's ability to obtain redress through the courts, and so *for the purpose of frustrating that right*, and that concealment, and the delay engendered by it substantially reduce the likelihood of one's obtaining the relief to which one is otherwise entitled.

<u>Gibson v. Superintendent of N.J. Dep't of Law & Pub. Safety – Div. of State Police</u>, 411 F.3d

---

4

Prisoners are limited to proceeding on access to courts claims challenging either their sentence (by direct or collateral attack) and their conditions of confinement, as the "impairment of any other litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration." <u>Lewis</u>, 518 U.S. at 355.

427, 445 (3d Cir. 2005). <u>See</u> <u>also</u> <u>Burkett v. Newman</u>, 2012 WL 1038914, at *3 (W.D. Pa. Fed. 21, 2012).

So then, in order to support his access to courts claims, Plaintiff is required to demonstrate that he has lost the opportunity to pursue a nonfrivolous or arguable underlying legal claim, that there is no other remedy available to him, and that Defendant Gilara had the requisite intent to deny his constitutional right of access to courts. Here, Plaintiff alleges that Defendant Gilara's confiscation of his legal property resulted in him missing a deadline to file a timely habeas corpus petition, and refers the Court to "Mattis v. Overmyer 16-3434, Third circuit Appellate Court." (ECF No. 3, Complaint, at ¶ 201). However, upon review of the docket in the referenced case, the Court takes judicial notice that on September 8, 2016, the Third Circuit Court granted Plaintiff a 45-day extension of time to supplement an already pending habeas petition, and that Plaintiff did, indeed, timely file the required supplement on October 25, 2016; nonetheless, the habeas petition was subsequently denied by the Court because Plaintiff failed to make a *prima facie* showing that his proposed claims satisfied the Section 2244 standard. <u>See</u> <u>In Re: Trevor Mattis</u>, No. 16-3434 (3d Cir. 2016). Thus, Plaintiff is unable to show that any action on the part of Defendant Gilara denied him the right "to pursue a 'nonfrivolous' or 'arguable' underlying claim," as is required to establish an access to courts claim. Thus, such claim will be dismissed.

### 3. Fourteenth Amendment Confiscation of Property Claims

Plaintiff raises two claims arising from the confiscation of his property, both of which are best construed as Fourteenth Amendment due process claims. The first is a claim against Defendant Gilara for confiscating Plaintiff's eyeglass strap (ECF No. 3, Complaint, at ¶¶ 199, 222), and the second is against Defendant Small for allegedly stealing and/or destroying

Plaintiff's creative works (i.e, poems, screenplays, and songs) (Id. at ¶¶ 212, 227). The DOC

Defendants argue that such claims must fail because the availability of a prison grievance

procedure satisfies all the requirements of due process. The Court agrees.

The Due Process Clause was promulgated to secure individuals from the arbitrary

exercise of the powers of government. The procedural aspect of the Due Process Clause

guarantees the availability of certain procedural mechanisms, typically the right to notice and a

hearing, before the government can deprive an individual of a liberty or property interest. In the

context of depriving an inmate of his property, however,

> ... the Supreme Court has held that meaningful post-deprivation remedies
> provide sufficient due process for negligent deprivations of property,
> Parratt v. Taylor, 451 U.S. 527, 530 (1981), and intentional deprivations
> of property, Hudson v. Palmer, 468 U.S. 517, 533 (1984), and that
> requiring a pre-deprivation hearing would be absurd since it would be
> impossible to determine when a negligent or intentional deprivation of
> property would occur. Zinermon v. Burch, 494 U.S. 113, 117 (1990).
> **The Court of Appeals has held that the DOC's grievance procedure
> provides an adequate post-deprivation remedy**, see e.g. Tillman v.
> Lebanon County Corr. Fac., 121 F.3d 410, 422 (3d Cir. 2000), **and that
> the existence of this post-deprivation remedy forecloses any due
> process claim**, Austin v. Lehman, 893 F.Supp. 448, 454 (E.D.Pa. 1995)
> even if an inmate is dissatisfied with the result of the process. Iseley v.
> Horn, 1996 WL 510090, at * 6 (E.D.Pa. Sept. 3, 1996). As [the inmate
> plaintiff] admits to having used the grievance procedure to attempt the
> return of his [property], he had access to an adequate post-deprivation
> remedy and even if there had been a violation of his liberty interest he
> was not denied the right to due process of law.

Pettaway v. SCI Albion, 2012 WL 366782 at *3-4 (W.D.Pa. Feb. 2, 2012), appeal dismissed, 487

Fed. Appx. 766 (3d Cir. 2012), citing Brooks v. DiGuglielmo, 2008 WL 5187529 at * 6 (E.D.Pa.

Dec. 9, 2008) (emphasis added). See also Monroe v. Beard, 536 F.3d 198, 210 (3d Cir. 2008)

("[b]ecause prisons are constitutionally required to afford inmates only a post-deprivation

remedy, we agree that the defendants' failure to give the inmates prior notice of their intended

seizure of their materials did not violate the plaintiffs' Due Process rights"); Banks v. Beard,

2006 WL 2192015 at * 15 (W.D.Pa. Aug. 1, 2006)(regarding inmate plaintiff's claim that he was

permanently dispossessed of his property, "[t]he Commonwealth of Pennsylvania provides an adequate post deprivation remedy in the forms of the DOC grievance system and/or a state law tort law suit against the Defendants... [which] satisfy the Fourteenth Amendment's procedural due process guarantee") (citations omitted).

Here, as in <u>Pettaway</u>, Plaintiff admits that he utilized the DOC's grievance process to attempt to obtain the return of the property he claims was improperly taken from his cell and never returned to him. Thus, he was provided access to an adequate post-deprivation remedy that has been held to satisfy his procedural due process rights, despite the fact that he is dissatisfied with the outcome. Accordingly, Plaintiff's due process claims arising from the confiscation of his property are without merit and will be dismissed.

### 4. Eighth Amendment Conditions of Confinement Claims

The Eighth Amendment, as applied to the states through the Fourteenth Amendment, protects against the infliction of "cruel and unusual punishments." U.S. Const. Amend. VIII. The failure to provided inmates with humane conditions of confinement can in some cases amount to cruel and unusual punishment. <u>Farmer v. Brennan</u>, 511 U.S. 825, 833 (1994) (citations omitted).

To succeed on an Eighth Amendment claim based on prison conditions, a plaintiff must show "he has suffered an objectively, sufficiently serious injury, and that prison officials inflicted the injury with deliberate indifference." <u>Farmer v. Brennan</u>, 511 U.S. 825, 834 (1994). An objectively, sufficiently serious injury is one that denies the inmate "the minimal civilized measure of life's necessities," such as food, water, shelter. <u>Rhodes v. Chapman</u>, 452 U.S. 337, 347 (1981); <u>see also</u> <u>Tillman v. Lebanon County Correctional Facility</u>, 221 F.3d 410, 419 (3d Cir. 2000); <u>Young v. Quinlan</u>, 960 F.2d 351, 364 (3d Cir. 1992) (holding that, at a minimum, correctional institutions must provide inmates with "adequate food, clothing, shelter, sanitation,

medical care, and personal safety"). However, in order for conditions of confinement to be

considered cruel and unusual under the Eighth Amendment, the deprivation of "the minimal

civilized measure of life's necessities" must be "widespread." See McCluskey v. Vincent, 505

Fed. Appx. 199, 204 (3d Cir. 2012) (internal citations omitted). Only extreme deprivations are

sufficient to establish an Eighth Amendment violation. See Dockery v. Beard, 509 Fed. Appx.

107, 112 (3d Cir. 2013), citing Farmer, 511 U.S. at 834; Rhodes, 452 U.S. at 347; Robles v.

Coughlin, 725 F.2d 12, 15 (2d Cir. 1983) (only a substantial deprivation of food to a prisoner

sets forth a viable Eighth Amendment claim).

Here, Plaintiff has raised several Eighth Amendment conditions of confinement claims

against various DOC Defendants: (1) a claim against Defendant Blicha for refusing to allow

Plaintiff to retain a cup in his cell (ECF No. 3, Complaint, at ¶¶ 204-205, 225); (2) a claim

against Defendant Small for exposing Plaintiff to O/C spray (Id. at ¶¶ 190-195, 226); (3); a claim

against Defendants Overmyer and Blicha for keeping Plaintiff in solitary confinement in "cold"

conditions for more than four weeks (Id. at ¶¶ 158, 237, 237b); (4) a claim against Defendant

Smith for failing to respond to sick call requests (Id. at ¶ 238); (5) claims against Defendants

Wetzel and Overmyer for failing to prevent alleged abuses by prison officials at SCI-Forest (Id.

at ¶¶ 228, 239); and (6) a claim against Defendant Overmyer for "forcing" Plaintiff to wear

"skippies" to the yard (Id. at ¶¶ 162-164, 177-182, 221). Each of these claims will be addressed

in turn.

### a. Refusing to Allow Cup to be Retained in Cell

Plaintiff alleges that Defendant Blicha's refusal to allow him to retain a cup in his cell

forced him to sip water from the water faucet, which prevented him from keeping his body

properly hydrated and from making tea with the tea bags he was allowed to purchase from

commissary. Even assuming Plaintiff's allegations are correct, the refusal to allow a cup for drinking water and tea falls far short of the level of deprivation required to establish an Eighth Amendment violation. See Dockery, 509 Fed. Appx. at 112, citing Farmer, 511 U.S. at 834 (holding that only extreme deprivations are sufficient to establish an Eighth Amendment violation). This claim will be dismissed accordingly.

### b.      Exposing Plaintiff to O/C/ Spray

Plaintiff alleges that Defendant Small violated his Eighth Amendment rights when he forced Plaintiff to remaining standing outside of his cell for over 20 minutes while being exposed to O/C spray that was utilized in the vicinity of Plaintiff's cell. (ECF No. 3, Complaint, at ¶¶ 190-193, 226).

In Passmore v. Ianello, 528 Fed. Appx. 144 (3d Cir.2013), the Third Circuit Court noted the prevailing view that:

> … use of tear gas is not *"a per se* violation of the Eighth Amendment...." Soto v. Dickey, 744 F.2d 1260, 1270 (7th Cir.1984). Rather, "[t]he use of mace, tear gas or other chemical agent of the like nature when reasonably necessary to prevent riots or escape or to subdue recalcitrant prisoners does not constitute cruel and inhuman punishment." Soto v. Dickey, 744 F.2d 1260, 1270 (7th Cir.1984). See also Michenfelder v. Sumner, 860 F.2d 328, 336 (9th Cir.1988) (policy allowing use of taser guns on inmate who refused to submit to a strip search does not constitute cruel and unusual punishment); Spain v. Procunier, 600 F.2d 189, 195 (9th Cir.1979) (the use of tear gas "in small amounts may be a necessary prison technique if a prisoner refuses after adequate warning to move from a cell or upon other provocation presenting a reasonable possibility that slight force will be required."); Clemmons v. Greggs, 509 F.2d 1338, 1340 (5th Cir.1975) (the use of tear gas when reasonably necessary to subdue recalcitrant prisoners does not violate the Eighth Amendment).

528 Fed. Appx. at 147–48.

Here, Plaintiff asserts that during a search of his cell, he was exposed to the remnants of OC spray that was used in the vicinity of his cell and Defendant Small failed to promptly remove

him from the area. According to Plaintiff, the exposure caused him to "cough uncontrollably" and Defendant Small refused to allow him to spit out mucus in a nearby trash can. Plaintiff filed two grievances following these events (ECF No. 48-2, Grievance Nos. 634801 and 634784), in which it was explained that the prison was under a limited state of emergency and cell searches, among other things, were being conducted. It was further explained that, given the need for heightened security on that particular day, Plaintiff had to remain in close proximity to his cell during the search. While Plaintiff may have been exposed to some OC spray, this exposure simply did not reflect deliberate indifference on the part of Defendant Small nor did it demonstrate behavior that ran afoul of the Eighth Amendment. This claim will, therefore, be dismissed.

### c.      Confinement in a "Cold" Cell for Over Four Weeks

Plaintiff asserts that Defendants Overmyer and Blicha violated his Eighth Amendment rights by placing him in solitary confinement in a "cold" cell for more than four weeks. (ECF No. 3, Complaint, at ¶ 237(b)). Plaintiff has not alleged, however, that he was denied "basic human needs, such as food, clothing, shelter, sanitation, medical care and personal safety." Griffin, 112 F.3d at 709. Instead, he seems to be generally complaining about conditions of confinement that confront many inmates in restricted housing in Pennsylvania's correctional institutions. However, "the federal and state Pennsylvania courts unanimously have found that the harsh conditions of confinement in the various restrictive housing units in the Pennsylvania state institutions, …, without more, do[] not violate the Eighth Amendment." Norris v. Davis, No. CIV.A. 10-1118, 2011 WL 1627340, at *6 (W.D. Pa. Apr. 28, 2011) (citing Griffin, 112 F.3d 703; Pressley v. Johnson, 268 Fed. App'x 181, 183 (3d Cir. 2008); Walker v. Campbell, Civ. No. 09–282, 2010 WL 2891488 (W.D. Pa. May 4, 2010); Fortson v. Kelchner, Civ. No. 08–

532, 2009 WL 693247, at *3 (W.D. Pa. Mar. 13, 2009); Milhouse v. Arbasak, Civ. No. 07–01442, 2009 WL 1119488, 3 (E.D. Pa. April 27, 2009); Pressley v. Blaine, 544 F.Supp.2d 446, 453 (W.D. Pa. 2008); Dantzler v. Beard, Civ. No. 05–1727, 2007 WL 5018184, at *11–12 (W.D. Pa. Dec. 6, 2007);  Banks v. Beard, Civ. No. 03–659, 2006 WL 2192015, at *11 (W.D. Pa. Aug.1, 2006)).

Because Plaintiff has failed to allege a deprivation of "the minimal civilized measure of life's necessities," McCluskey, 505 Fed. Appx. at 204, he has failed to raise a cognizable Eighth Amendment claim arising from his confinement in "cold" conditions for over four weeks. Accordingly, this claim will be dismissed.

### d.    Failure to Provide Medical Treatment

Plaintiff makes a single, bald assertion that Defendant Smith ignored his sick call requests and did not provide any medical treatment for over five weeks, in violation of his Eighth Amendment rights. (ECF No. 3, Complaint, at ¶ 238). No other allegations, of any kind, are asserted against Defendant Smith in the complaint. Thus, it appears Plaintiff's claim against Defendant Smith arises solely from her role as Health Care Administrator; however, as Health Care Administrator, Defendant Smith is considered a non-medical prison official in the context of a Section 1983 denial of medical care claim. See Spencer v. Beard, 2010 WL 608276, *4 n. 5 (W.D.Pa. Feb. 17, 2010), citing Hull v. Dotter, 1997 WL 327551, *4 (E.D.Pa. June 12, 1997). The case law is clear that Health Care Administrators are "undisputably administrators, not doctors…," Thomas v. Dragovich, 142 Fed. Appx. 33, 39 (3d Cir. 2005), who are "not charged with prescribing medication or providing [an inmate] medical care" and "lack[] any medical authority to dictate the course of [an inmate's] treatment." Ascenzi v. Diaz, 2007 WL 1031516, at *5 (M.D. Pa. Mar. 30, 2007).

The Third Circuit has held that prison officials who are not physicians cannot be considered deliberately indifferent simply because they failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor. Durmer v. O'Carroll, 991 F.2d 64, 68 (3d Cir. 1993). In Spruill v. Gillis, 372 F.3d 218, 236 (3d Cir. 2004), the Third Circuit expanded upon its reasoning in Durmer, as follows:

> Absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference.

Here, there are no allegations that Defendant Smith had the requisite knowledge or reason to believe that Plaintiff was being mistreated, or neglected treatment, by medical personnel. Thus, Plaintiff's claim against Defendant Smith will be dismissed and she will be terminated as a Defendant in this case.

### e.       Failure to Prevent Alleged Abuses by Prison Officials

Plaintiff alleges that Defendant Wetzel failed to "prevent further abuses" by SCI-Forest prison staff "after being duly notified by plaintiff" (ECF No. 3, Complaint, at ¶ 228), and that Defendant Overmyer "allow[ed], permit[ted], and condone[d] the harassment and abuse of plaintiff by RHU prison officials" (Id. at ¶ 239).

It is well-settled that liability under § 1983 requires a defendant's "personal involvement" in the deprivation of a constitutional right. See Gould v. Wetzel, 2013 WL 5697866, at *2 (3d Cir. Oct. 21, 2013), citing Argueta v. U.S. Immigration and Customs Enforcement, 643 F.3d 60, 73 (3d Cir. 2011). This means that the defendant must have played an "affirmative part" in the complained-of misconduct. Ashcroft v. Iqbal, 556 U.S. 662, 677 (2009) ("In a § 1983 suit … [a]bsent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct."); Oliver v. Beard, 358 Fed. Appx 297, 300 (3d Cir.2009);

Chinchello v. Fenton, 805 F.2d 126, 133 (3d Cir. 1986). Supervisory liability may attach if the supervisor personally "participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced" in a subordinate's unconstitutional conduct. A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr., 372 F.3d 572, 586 (3d Cir. 2004), citing Baker v. Monroe Twp., 50 F.3d 1186, 1190-91 (3d Cir. 1995).[5]

As to Defendant Wetzel, Plaintiff merely alleges that in August and September 2016, he wrote over four letters to Defendant Wetzel "detailing the abuses and harassments SCI-Forest prison officials were subjecting him to;" yet, he received no response. (ECF No. 3, Complaint, at ¶ 211). This allegation fails to establish Defendant Wetzel's personal involvement in the complained-of misconduct sufficient to state an Eighth Amendment claim upon which relief may be granted. Accordingly such claim will be dismissed and Defendant Wetzel will be terminated from this case.

As to Defendant Overmyer, it is apparent that Plaintiff's claim is based on Defendant Overmyer's role in the grievance process, through which Plaintiff alleges that "over 35 grievances between April and October [2016]… were summarily dismissed and/or denied." (Id. at ¶ 216). All of these grievances appear to have challenged the allegedly abusive treatment Plaintiff claims to have received at the hands of RHU prison officials (Id. at ¶¶ 171-215, generally). However, the Third Circuit has made clear that, if an official's only involvement is investigating and/or ruling on an inmate's grievance after the incident giving rise to the grievance has already occurred, there is no personal involvement on the part of that official. Rode v. Dellarciprete, 845 F.2d 1195, 1208 (3d Cir. 1988); Mincy v. Chmielsewski, 508 Fed.

_____

5

The Court notes that supervisory liability may also attach if the supervisor, "with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm." A.M. ex rel. J.M.K, 372 F.3d at 586, quoting Stoneking v. Bradford Area Sch. Dist., 882 F.2d 720, 725 (3d Cir. 1989). However, there are no allegations regarding a relevant policy, practice or custom in this case.

Appx. 99, 104 (3d Cir. 2013) (an "officer's review of, or failure to investigate, an inmate's grievances generally does not satisfy the requisite personal involvement"); <u>Pressley v. Beard</u>, 266 Fed. Appx. 216, 218 (3d Cir. 2008) ("The District Court properly dismissed these [supervisory] defendants and any additional defendants who were sued based on their failure to take corrective action when grievances or investigations were referred to them"). Accordingly, Plaintiff's claim against Defendant Overmyer in this regard will be dismissed.

### f. Forcing Plaintiff to Wear "Skippies" to the Yard

Plaintiff claims that Defendant Overmyer violated his Eighth Amendment rights by "forcing" him to wear "skippies" (presumably, state-issued footwear) to the yard, which allegedly prevented him from exercising properly and caused him to experience foot pain, damage to his "left index toe," and, ultimately, "chronic depression." (ECF No. 3, Complaint, at ¶¶ 162, 176-182, 221). However, the entirety of Plaintiff's allegations regarding his difficulties with wearing "skippies" are directed at Defendant McNeely who, according to Plaintiff, refused to diagnose Plaintiff's flat-footed condition and to advise RHU staff to allow him to wear boots to the yard. (<u>Id</u>. at ¶¶ 162-164). Nowhere within the body of the complaint is there any allegation against Defendant Overmyer supporting Plaintiff's claim that Overmyer "forced" Plaintiff to wear "skippies" to the yard. Instead, Plaintiff has made a single unsubstantiated allegation that fails to establish Defendant Overmyer's personal involvement in the complained-of misconduct, which is required to state a cognizable Eighth Amendment claim. As a result, this claim against Defendant Overmyer will be dismissed.

### 5. Z-code Claims

Plaintiff has asserted a number of claims arising from the removal of his Z-code classification: (1) Eighth Amendment and Fourteenth Amendment due process claims against

Defendants Overmyer, Gustafson, Cummins, Hasper, and Kennedy for removing Plaintiff's Z-code and forcing him to take a cellmate (Id. at ¶¶ 13-128, 229); (2) a Fourteenth Amendment equal protection claim against Defendants Overmyer, Gustafson, and Cummins related to the denial of Plaintiff's Z-code status (Id. at ¶¶ 13-128, 231); (3) an Eighth Amendment claim against Defendants Hasper, Simons, Cowen, Sheesley, and Kennedy for recommending the removal of Plaintiff's Z-code (Id. at ¶¶ 39-44, 76-82, 209, 232); and (4) an Eighth Amendment claim against Defendants Best, Mealy, and Anthony for requiring Plaintiff to take a cellmate (Id. at ¶¶ 104-128, 233).

The DOC Defendants assert that such claims "must be dismissed as Plaintiff does not have a constitutional right to a particular cell assignment" (ECF No. 48, Defendants' Brief, at p. 21); however, this argument is simply too generic and fails to take into account the underlying allegations of each claim, which will be addressed in turn. As for Defendant Hasper, he erroneously argues that "Plaintiff did not identify Dr. Hasper as a member of the PRT, and it is quite clear that Dr. Hasper was not present during any conversation about the revocation of Plaintiff's Z-code," despite Plaintiff's specific identification of Defendant Hasper as a member of the PRT that was responsible for removing his Z-code, and his further allegation that "[t]he psychology department perfunctorily does a PRT review with the predetermined result of recommending removing the inmate's Z-code." (ECF No. 3, Complaint, at ¶¶ 91, 232). Thus, Defendant Hasper's motion to dismiss Plaintiff's Z-code claims against him based upon his lack of involvement will be denied.

### a. Eighth Amendment Claims

Although Plaintiff's Eighth Amendment claims are asserted against three sets of Defendants (some of whom overlap), all of the claims arise from the same circumstance – the

denial and/or removal of Plaintiff's Z-code. This Court has previously recognized that, in general, the denial of Z-code status, by itself, is not cruel and unusual punishment and does not rise to the level of an Eighth Amendment violation. Gellock v. Prison Health Services, Inc., 2009 WL 2038235, at *8 (W.D. Pa. July 8, 2009), citing Rhodes v. Chapman, 452 U.S. 337 (1986). The Third Circuit has noted, however, that "double celling can amount to an Eighth Amendment violation if combined with other adverse conditions." Nami v. Fauver, 82 F.3d 63, 67 (3d Cir.1996) (finding that, if proven, allegations that plaintiffs were subject to sexual assault and that prison officials failed to protect them adequately by placing them in double cells, could establish deliberate indifference, "irrespective of whether the harm resulted from double celling or other conditions of confinement").

Here, Plaintiff alleges that he "has particular mental health issues (PTSD, paranoia, anxiety) that make him incompatible with a cell mate," and that "[d]ouble celling exacerbates [his] mental health issues and makes him act out violently towards his cell partner," noting that he has had violent altercations with his previous three cell mates. (ECF No. 3, Complaint, at ¶¶ 10E-10F). Plaintiff alleges that his "chronic anxiety disorders … stem from a brutal beating he suffered at the hands of prison guards in 1990 that required extensive reconstructive surgery; and a brutal attack by a cell mate while plaintiff slept in the bunk during which plaintiff sustained severe injuries." (Id. at ¶ 14). Thus, Plaintiff alleges that when he is celled with another inmate, he cannot sleep, concentrate, or function in a normal manner; he suffers "excruciating and debilitating headaches that last for hours or days; and he becomes "hyper-irritable, volatile, [and] violent…." (Id. at ¶¶ 16-17).

Courts have found similar allegations sufficient to state an Eighth Amendment claim at the pleading stage. See Hughes v. Miskell, 2010 WL 8499990, at *13 (M.D.Pa. Dec. 28, 2010)

(finding that inmate's allegations that he "suffered increased episodes of anxiety and depression as well as psychotic episodes by being housed with another inmate… sufficiently alleged facts from which it can be reasonable inferred that 'he is in imminent danger of substantial injury as a result of being double-celled'") (citation omitted); Cryer v. Spencer, 2012 WL 892883, at *2 (D. Mass. Mar. 15, 2012) (upholding inmate's allegation that he had mental disorders that posed a substantial risk of serious harm to himself and any inmate placed in his cell); Dye v. Grisdale, 2011 WL 5110402, at *3 (W.D. Wisc. Oct. 25, 2011) (upholding inmate's allegations that he suffered from severe anxiety and depression, and an "eating disorder/phobia," that were exacerbated by external stimuli such as noise and the presence of a cell mate); Wilson v. Tilton, 2009 WL 3246430, at *9 (E.D. Cal. Oct. 6, 2009) (upholding inmate's allegations that he threatened to kill his cellmate and suffered sleep deprivation and mental health breakdowns when celled with another inmate).

Moreover, Plaintiff has alleged that he was assigned a Z-code from the time of his diagnoses in 1992 to August 2012, when his Z-code was allegedly removed (ECF No. 3, Complaint, at ¶ 13), and that, since the removal, he has notified all Defendants of his need for a single cell due to his "psychological problems" (Id. at ¶¶ 21-43; 53-55; 104-119; 187). Thus, all of the named Defendants were certainly aware of Plaintiff's cell history and his stated need for a single cell.

Based on the foregoing, the Court finds that Plaintiff has stated cognizable Eighth Amendment claims based upon the removal of his Z-code status to allow such claims to proceed beyond the pleading stage against those Defendants allegedly responsible for such removal. Accordingly, Defendant Hasper's and the DOC Defendants' motions to dismiss such claims will be denied.

### b.    Fourteenth Amendment Due Process Claim

The DOC Defendants' blanket argument that Plaintiff "does not have a constitutional right to a particular cell assignment" is most applicable to Plaintiff's Fourteenth Amendment due process claim against Defendants Overmyer, Gustafson, Cummins, Hasper, and Kennedy.

"It is well established that the United States Constitution does not confer any right upon an inmate to any particular custody or security classification." Keeling v. Barrager, 2014 WL 1338077 at *6 (M.D.Pa. Apr. 3, 2014), aff'd 666 Fed. Appx. 153 (3d Cir. 2016), citing Moody v. Daggett, 429 U.S. 78, 88 (1976); Montanye v. Haymes, 427 U.S. 236, 242 (1976). Inmates do not have a liberty interest in retaining or receiving any particular security or custody status "[a]s long as the [challenged] conditions or degree of confinement is within the sentence imposed ... and is not otherwise violative of the Constitution." Moody, 429 U.S. at 88. "[T]he ultimate decision concerning an inmate's cell status is not in any way mandated by application of [DOC] policy, but rather is left to the discretion of prison personnel." Hodges v. Wilson, 2008 WL 5049742, *2 (W.D.Pa. Nov. 2008), aff'd. 341 Fed. Appx. 846 (3d Cir. 2009). Thus, an inmate "has no protected liberty interest in receiving Z-code status and [a] due process claim is untenable." Id. citing Henry v. Wilson, 2007 WL 2746717 *7 (W.D.Pa., September 17, 2007); Austin v. Chesney, 1995 WL 498720, at *3 (E.D.Pa. August 22, 1995) (holding that DOC policy did not create any protected liberty interest in Z-code status).

Because the removal of Plaintiff's Z-code does not implicate a recognized liberty interest, Plaintiff is unable to state a cognizable Fourteenth Amendment due process claim. Accordingly, such claim will be dismissed as against Defendants Overmyer, Gustafson, Cummins, Hasper, and Kennedy.

### c.    Fourteenth Amendment Equal Protection Claim

The Equal Protection Clause provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1. "This is not a command that all persons be treated alike but, rather, 'a direction that all persons similarly situated should be treated alike'" Artway v. Attorney General of State of N.J., 81 F.3d 1235, 1267 (3d Cir. 1996), quoting City of Cleburne, Tex. v. Cleburne Living Center, 473 U.S. 432, 439 (1985). Classifications involving a suspect or quasi-suspect class, or actions that impact certain fundamental constitutional rights, are subject to heightened or "strict" scrutiny. City of Cleburne, 473 U.S. at 439. Other classifications are subject to the "rational basis" test, which requires that a classification need only be rationally related to a legitimate state interest to survive an equal protection challenge. F.C.C. v. Beach Communications, Inc., 508 U.S. 307 (1993) (state action that does not affect a suspect category or infringe on a fundamental constitutional right must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification); Chapman v. United States, 500 U.S. 453, 465 (1991).

Here, the DOC Defendants assert that "Plaintiff has not provided a single shred of evidence to support his claim of discrimination. There are no allegations that the DOC Defendants treated other inmates differently from Plaintiff, nor are there specific facts (or any facts, for that matter) to demonstrate any purposeful discrimination (or any discrimination, at all)." (ECF No. 48, Defendants' Brief, at p. 18). At best, Defendants' assertions are misguided and, at worst, are disingenuous.

Initially, the Court should not have to point out that Plaintiff is not required to provide evidence supporting his claims at the pleading stage. Nonetheless, Plaintiff has alleged more than enough to substantiate his claim that Defendants Overmyer, Gustafson, and Cummins subjected

him to "harsher treatment than other similarly situated inmates, in that [they] assigned Z-codes to many inmates who do not fulfill the criteria for a Z-code and assign Z-codes to other inmates who have the same or similar mental disabilities as plaintiff but denied plaintiff a Z-code" and, thus, "violated plaintiff's Fourteenth Amendment right to Equal Protection." (ECF No. 3, Complaint, at ¶ 231). In particular, Plaintiff, an African American and, thus, a member of a suspect class, alleges that Defendants "mainly target African American and Hispanic inmates to remove their Z-codes," while "[m]ost white inmates who have Z-codes and are in an identical or substantially similarly situated circumstance are allowed to keep their Z-codes unmolested." (Id. at ¶ 92). Plaintiff claims further that "the SCI-Forest psychology department operates with a clear racial bias" regarding the assignment of Z-codes, specifically alleging that "a majority of Black and Hispanic inmates [are] misdiagnosed with Anti Social Behavior Disorder or an Adjustment Behavior Disorder," while "a White inmate in the identical circumstances, with the same symptoms the White inmate's problem is properly diagnosed as a mental issue and not a behavioral one, thereby justifying assigning this inmate a Z-code or allowing him to keep his Z-code." (Id. at ¶ 93). Plaintiff goes even further, alleging that Defendants "maintain a practice of orchestrating violence among inmates in what is commonly referred to as the 'Forest Fight Club'" by removing Z-codes from primarily Black and Hispanic inmates who have a "history or propensity for violent and/or predatory behavior toward cell partners" and forcing them to be double-celled. (Id. at ¶ 99).

All of the foregoing allegations, taken together, state a cognizable Fourteenth Amendment equal protection claim sufficient to overcome dismissal at the pleading stage. Defendants' motion to dismiss such claim will be denied accordingly.

**6.** **Fourteenth Amendment Equal Protection Claim – RRL Placement**

29

Plaintiff alleges a second Fourteenth Amendment equal protection claim against Defendants Overmyer, Best, and Cummins arising from their recommendation that he be placed on the Restrictive Release List ("RRL") while other similarly situated inmates were not. However, unlike the former equal protection claim, this claim is unsubstantiated. Plaintiff merely alleges that on April 21, 2016, Defendant Best told him that he was being recommended for the RRL (Id. at ¶ 152), and on August 26, 2016, he was seen by the Program Review Committee (presumably staffed by Defendants Overmyer, Best, and Cummins, among others), who informed Plaintiff that he was being placed on administrative custody status pending a review for placement on the RRL (Id. at ¶¶ 196-198). Plaintiff has failed to allege whether he was actually placed on the RRL at any time after either of these encounters, and he has also failed to allege that Defendants' actions were discriminatory. He merely concludes that these recommendations to be placed on the RRL were not given for other similarly situated inmates. (Id. at ¶ 236). These allegations are insufficient to state a cognizable equal protection claim and the same will be dismissed.

### 7. ADA and Rehab Act Claims

Plaintiff claims that Defendants DOC, Overmyer, and Smith refused "to make reasonable accommodations for his mental disability of PTSD by assigning him a Z-code after [he] made a specific request for them to do so" in violation of Title II of the ADA and the Rehab Act.[6]

Title II of the ADA provides, in relevant part, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the

_____

[6] The substantive standards for determining liability under the ADA and the Rehab Act are identical and are subject to the same analysis by the courts. McDonald v Pennsylvania, 62 F.3d 92, 95 (3d Cir. 1995); Sherer v. Pennsylvania Dept. of Corr., 2007 WL 4111412, at *8 (W.D.Pa. 2007) (citation omitted). Thus, the Third Circuit Court of Appeals has found that they are appropriately considered in tandem. Pennsylvania Protection and Advocacy, Inc. v. Pennsylvania Dept. of Public Welfare, 402 F.3d 374, 379 n.3 (3d Cir. 2005). Accordingly, only the ADA claim will be addressed here, with the understanding that the same analysis holds true for the Rehab Act claim.

benefits of the services or activities of a public entity or be subjected to discrimination by such entity." 42 U.S.C. § 12132. The term "public entity," as defined by Title II of the ADA, does not include individuals. 42 U.S.C. § 12131(1). Thus, the law is clear that individuals, sued in their official capacities, are not "public entities" under the ADA and are not subject to liability thereunder. Emerson v. Thiel College, 296 F.3d 184, 189 (3d Cir. 2002) (individuals are not subject to liability under Titles I or II of the ADA). Accordingly, Plaintiff's ADA and Rehab Act claims against the Defendants Overmyer and Smith in their individual capacities are barred as a matter of law and will be dismissed.

Nonetheless, the Third Circuit has recognized the right to sue state officials under the ADA and Rehab Act to the extent a plaintiff seeks prospective injunctive relief against the state officials acting in their official capacities. Koslow v. Commonwealth of Pa., 302 F.3d 161, 178 (3d Cir. 2002). In this case, Plaintiff seeks prospective injunctive relief against Defendant Overmyer in the form of an order to, *inter alia*, "[i]mmediately re-instate plaintiff's Z-code/single cell status" (ECF No. 3, Complaint, at ¶ 247(e)(ii). Thus, the Court must determine whether Plaintiff has set forth sufficient allegations to satisfy the standards of the ADA (and the Rehab Act) to maintain an action against Defendant Overmyer for prospective injunctive relief, and against Defendant DOC, in general.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subject to discrimination by any such entity." 42 U.S.C. § 12132; Iseley v. Beard, 200 Fed. Appx. 137, 142 (3d Cir. 2006). Here, the DOC Defendants assert that Plaintiff falls short of stating a claim under the ADA because he

does not allege that the failure to accommodate his alleged disabilities precluded him from participating in a service, program, or activity. The Court agrees.

It is apparent from Plaintiff's allegations that his ADA and Rehab Act claims are based solely on the Defendants' decision to remove his Z-code status and their refusal to reinstate it. Thus, his only criticism is that he was not given the medical accommodation he requested—a single cell, which does not implicate a service, program, or activity contemplated by the ADA. See Iseley, 200 Fed. Appx. at 142 (finding that plaintiff had not claimed that he was excluded from any program on the basis of his disability but rather alleged "that he was denied medical treatment for his disabilities, which is not encompassed by the ADA's prohibitions"), citing Bryant v. Madigan, 84 F.3d 246, 249 (7th Cir.1996) ("[I]ncarceration, which requires the provision of a place to sleep, is not a 'program' or 'activity.' Sleeping in one's cell is not a 'program' or 'activity'"); Riley v. Grainey, 2015 WL 5693805, at *3 (M.D.Pa. Sept. 24, 2015) (finding that inmate failed to adequately plead that he was denied the benefit of a specific prison service, program, or activity as a result of defendant's failure to accommodate him with a single cell); Thomas v. Pa. Dep't of Corr., 615 F.Supp.2d 411, 429 (W.D.Pa.2009) (holding that plaintiff's requests for a handicap cell that were denied based on a medical determination that they were not warranted did not support discriminatory treatment in violation of Title II of the ADA); Redding v. Hanlon, 2008 WL 762078, at *16 (D. Minn. Mar. 19, 2008) (dismissing inmate's ADA claim where the plaintiff alleged that the defendants had denied him the single cell accommodation ordered by his doctor, not that he had been denied access to any service or program).

Based on the foregoing, Plaintiff's ADA and Rehab Act claims will be dismissed in their entirety.

## 8.    Intentional Infliction of Emotional Distress

Lastly, Plaintiff claims that Defendants Gustafson, Cummins, Best, and Anthony committed the state tort of intentional infliction of emotional distress by "orchestrating a violent confrontation with other inmates" in order "to exploit plaintiff's mental disabilities, goad, taunt, and threaten plaintiff with physical harm." (ECF No. 3, Complaint, at ¶ 234).

The Third Circuit has described Pennsylvania's standard with regard to such claims as follows:

> While the Pennsylvania Supreme Court has yet to formally recognize a cause of action for intentional infliction of emotional distress, see Taylor v. Albert Einstein Med. Ctr., 562 Pa. 176, 754 A.2d 650, 652 (2000), the Pennsylvania Superior Court has recognized the cause of action and has held that, "in order for a plaintiff to prevail on such a claim, he or she must, at the least, demonstrate intentional outrageous or extreme conduct by the defendant, which causes severe emotional distress to the plaintiff." Swisher v. Pitz, 868 A.2d 1228, 1230 (Pa.Super.Ct.2005) (discussing how the Pennsylvania Supreme Court has indicated that, were it to recognize a cause of action for intentional infliction of emotional distress, these would be the requirements necessary for a plaintiff to prevail on such a claim). In addition, "a plaintiff must suffer some type of resulting physical harm due to the defendant's outrageous conduct." Id. Liability on an intentional infliction of emotional distress claim "has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Field v. Phila. Elec. Co., 388 Pa.Super. 400, 565 A.2d 1170, 1184 (1989).

Reedy v. Evanson, 615 F.3d 197, 231-32 (3d Cir. 2010).

Here, Plaintiff has alleged that, despite his numerous warnings that he would turn violent if placed with a cellmate, Defendants placed an inmate in his cell on March 30, 2016, resulting in a violent confrontation that caused Plaintiff to suffer injuries to his head, right wrist, left knee, and lower back. (Id. at ¶¶ 121-130). Although it is arguable whether Defendants' conduct went

"beyond all possible bounds of decency," the Court finds that Plaintiff has pled enough facts to support a claim of intentional infliction of emotional distress at the pleading stage.

      An appropriate Order follows.


              /s/ Susan Paradise Baxter
              SUSAN PARADISE BAXTER
              United States Magistrate Judge